W. S. DICKEY CLAY MFG. Co., Appellant,

*v.*

J. M. DICKINSON, Com'r, etc., Appellee.

(*Nashville,* December Term, 1955.)

Opinion filed February 3, 1956.

MILLER, MARTIN, HITCHING & TIPTON, Chattanooga, for Complainant.

GEORGE F. McCANLESS, Attorney General; ALLISON B. HUMPHREYS, Solicitor General, and MILTON P. RICE, Assistant Attorney General, for defendants.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

We take this statement of the case from the brief of appellant.

This appeal by W. S. Dickey Clay Mfg. Co., a Delaware corporation, with general offices in Kansas City, Missouri, hereinafter called Dickey, is from a decree of the Chancery Court, Davidson County, Tennessee, holding it liable for $6,772.36 additional excise taxes assessed by the Commissioner of Finance and Taxation of Tennessee, hereinafter called the Commissioner, under section 1316, Code of Tennessee, for the years 1950 and 1951.

Dickey, a manufacturer of glazed clay sewer pipe and allied clay products, with 5 plants in 4 states, filed its excise tax returns for the years involved on the basis of applying the statutory formula to the earnings of the Chattanooga plant only. The Commissioner refused to accept the returns on this basis and applied the statutory formula to the combined earnings of all five plants, resulting in the assessment of the additional excise taxes in question.

Dickey requested the Commissioner to exercise the discretion given him in Code sec. 1316 and either apply the formula to the earnings of the Chattanooga plant alone or adopt some other method of apportionment that would be fair and just under all circumstances. The Commissioner refused to do this and the additional taxes were paid under protest and suit was seasonably brought for their refund.

Dickey's complaint states, and it contended in the Court below, that the Commissioner either should have applied the formula to the Chattanooga earnings alone or adopted some other method of apportionment because (a) its business is multi-form in character, not unitary;

(b) the application of the formula to the combined earnings of all five plants is contrary to Code sec. 1316 and violates the due process clause of the 14th Amendment to the United States Constitution in that it taxes earnings which were neither derived from nor reasonably attributable to business done by Dickey in Tennessee, but which were earned elsewhere; and (c) the Commissioner abused his discretion in failing and refusing to adopt a so-called "hardship" formula, under the facts and circumstances of this case. (Original bill, R. 1-8; R. 112-113.)

The Commissioner, in his answer and in the court below, took the position that Dickey's business was unitary, and that there were no peculiar or unusual circumstances present in its method of operation which would warrant his adopting a "hardship" formula and that the application of the statutory formula to the combined earnings of all its plants violated neither sec. 1316 nor the due process clause of the 14th Amendment. (Ans.R. 10-15.)

The Chancellor held that Dickey's business was a unitary one and the application of the statutory formula to the combined earnings of all 5 plants was proper and did not violate either the provisions of Code, sec. 1316 or the due process clause of the 14th Amendment, and accordingly he dismissed the bill. (Chancellor's opinion, R. 105-111.)

The three assignments of error are directed at the adverse findings of the Chancellor to propositions (a), (b) and (c) above stated.

The Chancellor made the following findings of fact: "An appropriate answer was filed by the defendant Commissioner in which it was denied that complainant's business was multiform, and averred that it was unitary,

and that its operations in Tennessee were taxable under the excise tax formula, as provided in said section 1316 et seq. The answer further denied that the defendant abused his discretion in refusing to allow a hardship formula, and also denied that the exaction of the taxes in question was in violation of the Federal Constitution.

It appears from the record, and the Court finds that the complainant is engaged primarily in manufacturing and selling glazed clay sewer pipe, but does manufacture other types of clay materials. It has 5 manufacturing plants, one of which is in Kansas, two in Texas, one in Birmingham, Alabama, and one in Chattanooga, Tennessee. The manufacturing process consists of grinding clay, moistening it, glazing it with salt, and burning it in kilns. The clay which is used in the Chattanooga plant is taken from a pit at Graysville, Tennessee, some 30 odd miles from the manufacturing plant, and the Birmingham plant gets a small percentage of the clay it uses from the Graysville pit. Until recently the kilns were fired with coal in Tennessee, but in 1953 it was changed to gas firing.

The Chattanooga plant manufactures everything it sells and sells everything it manufactures. Chattanooga sells its products exclusively in the State of Tennessee, Kentucky, Virginia, North Carolina and Georgia. It has 6 traveling salesmen, all of whom are hired by, paid by, and responsible solely to Chattanooga.

Invoices are rendered by Chattanooga and customers' remittances are made to the plant there. The manager of each plant works under a separate bonus system, which is based on net profits determined by that particular plant, and these managers are free to buy from what-

ever source they desire and where they can get the best prices.

The complainant has no advertising department and does no national advertising. A Chicago advertising agency submits plans, suggestions and costs to the plant managers at a called meeting for that purpose, and the plant manager decides what advertising is to be done.

The expense incident to maintaining the general offices in Kansas City are prorated and allocated among the several manufacturing plants. A research laboratory for the benefit of all the plants is operated at and by the central office. The type and kind of equipment installed at Chattanooga was determined on the basis of the experience of the corporation as a whole, when the Chattanooga plant was transferred from a coal burning unit to a gas burning unit, the capital outlay was borne from the general assets of the corporation. The manufacturing experiences at all of the plants is available to other plants.

Various reports are made constantly from the Chattanooga plant to the central office on forms and stationery furnished by the Kansas City office, and the costs are charged against the Tennessee operation.

Complete records are kept at Chattanooga covering the manufacture and sale of the clay products, and, likewise, complete records are kept at the central office, based on reports from each plant, and all general accounting books are kept at the central office.

The Chattanooga plant maintains two bank accounts. Checks are drawn by said plant to cover the payrolls, freight charges and miscellaneous purchases. In other instances checks with vouchers attached are forwarded to Kansas City, where they are audited and mailed out.

The complainant's Board of Directors meets monthly in Kansas City and determines the policies of the corporation.

■ These findings are well supported by the proof. Among other things, it appears that until November 1953, the Chattanooga plant was the only one that was using coal instead of natural gas in their kilns. The operation at Chattanooga was more expensive than at any of the other plants. The determination to convert to gas was made on the basis of the experience of all the other plants by the central office at Kansas City, Missouri. The determination of the type of machinery to be installed was also determined by the central office and the cost of same which ran around $50,000, was paid for not by the Chattanooga plant but by the corporation which owned all of the plants.

■■ That alone, in the opinion of this Court, is a very important factor for the reason that you cannot speak of profits without taking into account the capital investment originally to build a plant, and then the cost of maintenance, including the cost of replacement or conversion of the parts or of the whole machinery of the plant.

■ It appears also that machine shops are maintained at each of the plants and they repair equipment indiscriminately for one another.

■ Another important item is that the corporation owns a clay pit located at Graysville, Tennessee, about 30 miles from the Chattanooga plant. It appears that the plant in Birmingham, Alabama, uses an appreciable quantity of clay from this plant, running from 50 to 25 percent of the total amount of clay used by it. No profit is credited to the Chattanooga plant for the clay that is

thus furnished the Birmingham plant. The cost of the operation of this pit is shared by Birmingham and Chattanooga plants on a ton-cost basis which averages about $1.27 per ton.

Another important fact is the lack of competition between these several plants. Each has its separate, definite territory marked off and none of the other plants can invade the territory of any particular one. This is particularly significant in Tennessee where the Chattanooga plant has enjoyed the monopoly of clay products manufactured in this state since the year 1905.

Another important fact is that while the Chattanooga plant, as well as the others, buys on the open market at the most advantageous price, yet if one of these plants of the corporation purchases material from another a flat discount of $2.20 per ton is allowed.

While each plant supposedly fixes the sale price of its products, it is plain that the ultimate control of sale price is with the central office in Kansas City.

From these facts the Chancellor thought that the case of *Butler Bros. v. McClogan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991, which case has been referred to and approved in several of our more recent cases, such as *Crane Co. v. Carson,* 191 Tenn. 353, 234 S.W.2d 644, and cases therein cited, presented an appropriate analogy. On the authority of that case he concluded that the unity of ownership, the unity of management, and the unity of the use to a greater or lesser extent, which is found in the instant case, sustains the right of the State to tax on the basis of an allocation formula.

While the facts are not identical, we are nevertheless of the opinion that the Chancellor's conclusion was correct. For the coexistence of these three unities charac-

terize the business of the corporation as being unitary and not multiform.

This ultimate conclusion of fact that the business of this corporation is unitary renders inapplicable the cases cited that relate to businesses which are multiform.

This conclusion of fact brings us to a consideration of the other two assignments of error which are referred to by propositions (b) and (c) supra. Since we hold that the business is unitary, the excise tax law, Code, sec. 1316 et seq., becomes applicable and the only inquiry is whether or not it was properly applied, for as said in *Reynolds Tobacco Co. v. Carson,* 187 Tenn. 157, 169, 213 S.W.2d 45, 50:

"It is only when application of the formula results in allocating to the taxing state an amount of earnings or net worth palpably disproportionate to the business done or property owned in the taxing state that the 'due process clause' of the Federal Constitution may be successfully invoked by the corporation taxed."

The burden of proof rests upon the taxpayer to show by clear and cogent evidence that the formula of apportionment provided by the above statute results in taxation of value outside the state. *General Shoe Corp. v. Stokes,* 181 Tenn. 286, 290, 181 S.W.2d 146. The only showing by appellant in addition to the attempt to show the business to be multiform is the profit and loss statement for each of the plants, both in and out of the state. But that is insufficient because the excise tax returns and the ratios made thereon so as to prove that the ratios resulted in taxation of out-of-state values are not in evidence. Hence there is not any proof that the tax was in violation of the 14th Amendment and necessarily, also, there is not any proof that the Commissioner

abused his discretion in not applying a "hardship" formula.

The decree of the Chancellor is affirmed.